Argued and submitted February 6, at University of Oregon, Eugene; judgment of dissolution modified to award wife $140,282.50; otherwise affirmed July 26, 2006

In the Matter of the Marriage of

Douglas Campbell LIND,
*Appellant,*

*and*

Lorrie Anne LIND,
*Respondent.*

03 30074; A126809

139 P3d 1032

Lauren Saucy argued the cause for appellant. With her on the brief was Paul Saucy, P.C.

John Barlow argued the cause for respondent. With him on the brief was Barnhisel Willis Barlow & Stephens, PC.

Before Landau, Presiding Judge, and Schuman, Judge, and Mitchell, Judge pro tempore.

SCHUMAN, J.

Mitchell, J. pro tempore, concurring in part and dissenting in part.

## SCHUMAN, J.

Husband appeals from a general judgment dissolving his marriage. In particular, he disputes the trial court's division of two items of marital property (an investment account and a house), the amount and duration of spousal support that the court ordered him to pay wife, and the court's ruling that he had to pay $3,206 toward wife's costs and attorney fees. We modify the property division and otherwise affirm.

## I. FACTS

On *de novo* review, we find the following facts, giving due deference to the trial court's implied credibility findings. ORS 19.415(3); *Tomos and Tomos*, 165 Or App 82, 87, 995 P2d 576 (2000). At the time that their marriage was dissolved, wife was 39 and husband was 51. Wife had a teenaged son from an earlier marriage. The relationship between husband and wife can be divided chronologically into two relevant periods. The first began in February 1994, when, after a three-year long-distance relationship, wife moved with her son from Florida to California to live with husband in his apartment. Husband at that time was employed as an accountant and also had an investment portfolio worth $330,353 that had been given to him by his parents in 1973. When she moved in with husband, wife had very few personal belongings and no debt; having left her employment in Florida, her only source of income was $55 per week in child support from her son's father. Several months after moving in with husband, wife found employment and, because she did not have a checking account, she signed over to husband all of her employment income, as well as her child support income. The money went into husband's individual checking account, from which he paid for household needs. During that time, wife also cooked, cleaned, cared for her son, and otherwise maintained the home.

The parties lived in California until July 1996, when they relocated to Oregon. At first, they lived in rentals. Wife continued to contribute her employment income and child support (which, by that time, had increased to $100 per week)

to household expenses, but husband's income paid for the rent and most of the couple's other needs. Together, husband and wife looked for and purchased (with husband's money) a residential lot (the Corvallis lot) in December 1997, intended for the future construction of a home. Husband paid for the lot with $92,000 taken from his investment portfolio, and it was titled in his name alone.

Some time before spring of 1998, the parties decided to marry. In late March or early April, husband presented wife with a prenuptial agreement. Wife elected to discuss it with her attorney and, as a result of that consultation, suggested changes that would have allowed for an equitable allocation of assets that had been acquired during the parties' preceding four-year cohabitation. Husband never agreed to those changes, however—at least not in writing—and, in any event, the document was never signed. Shortly thereafter, in April 1998, the parties married. That event marks the start of the second period in the parties' relationship.

When the parties married, husband's investment portfolio had increased in value by $942,409 and was valued at $1,272,762. At some point after marriage, husband made wife an authorized signer on his credit card, and husband and wife opened a joint bank account into which wife's employment paycheck was automatically deposited. Husband typically deposited between $1,000 and $1,500 per month into that joint account, from which the parties paid for household expenses such as credit card bills, gas, food, wife's son's needs, and automobile insurance. Husband also maintained an individual checking account into which he deposited the remainder of his employment income as well as half of the dividends he received from his investment portfolio, approximately $550 per month. The remaining half was reinvested.

From his individual account, husband paid the mortgage and insurance on the house that was built on the Corvallis lot shortly after the parties married. The title and mortgage were in husband's name alone, although wife did not discover that fact until September 2001, when husband

refinanced the home. The down payment and part of the construction costs, $100,000, came entirely from husband's investment portfolio.[1] Wife provided significant input regarding the design and decoration of the house, although husband had more interaction with the contractor and subcontractors than did wife.

Husband filed for dissolution of the marriage in February 2003. By that time, the value of husband's investment portfolio had fallen to $671,514.[2] In November 2004, the court entered a general judgment of dissolution. Husband received as separate property the value of his investment portfolio at the time the parties' cohabitation began. The court treated the appreciation in value of the portfolio during cohabitation and marriage, as well as the Corvallis residence, as marital assets, and determined that, with respect to them, husband did not overcome the presumption that wife contributed equally to their acquisition; it therefore totaled their value—$341,211 in portfolio appreciation and $220,000 in equity in the home, or $561,211—and awarded each party half, or $280,605. The court also awarded wife an additional judgment of $30,282.50 to equalize the division of other assets, spousal support in the amount of $500 per month for three years or until the equalizing judgment was paid in full (whichever came first), and $3,206 in attorney fees and costs. Husband, as noted above, assigns error to the property division, the amount and duration of spousal support, and the award of attorney fees to wife.

## II. PROPERTY DISTRIBUTION

### A. *Method of analysis*

In dividing the parties' property, we follow ORS 107.105(1)(f)[3] as construed in *Kunze and Kunze*, 337 Or 122,

---

[1] The record indicated a down payment and payment of construction costs of between $100,000 and $125,000. Because a more precise figure was within husband's ability to offer, we find the amount to be $100,000.

[2] The trial court found the present value of this portfolio to be $671,564. Based on our calculation of husband's investments on his asset and liability statement, the value of the portfolio at the time of trial was $671,514.

[3] ORS 107.105(1) provides, in part:

"Whenever the court renders a judgment of marital annulment, dissolution or separation, the court may provide in the judgment:

92 P3d 100 (2004). Under that case, we undertake a structured series of inquiries, described and elaborated by the Supreme Court as follows:

"Because ORS 107.105(1)(f) distinguishes between property brought into the marriage and marital assets, the court's first step in applying that statute is to determine when the parties acquired the property that is at issue. If the parties acquired the property at issue before the marriage, then the court considers only what is 'just and proper in all the circumstances' in distributing that property. ORS 107.105(1)(f).

"If a party establishes that the property at issue is a marital asset, however, then the court must apply the rebuttable presumption of equal contribution under ORS 107.105(1)(f) as its next step in the analysis. * * * [T]he presumption directs the court that, unless proven otherwise, the court must find that both parties have contributed equally to the acquisition of marital assets. When the statutory presumption is not rebutted, this court has determined that, absent other considerations, the 'just and proper' division of the marital assets is an equal division between the parties.

"Because the presumption of equal contribution under ORS 107.105(1)(f) is rebuttable, either or both of the parties may seek to overcome it. If a party seeks to overcome that presumption, then that party has the burden of proving by a preponderance of the evidence that the other spouse's efforts during the marriage did not contribute equally to the acquisition of the disputed marital asset. In assessing whether a party has satisfied that burden, ORS 107.105(1)(f) requires the court to consider both economic and noneconomic spousal contributions, including the contributions of a spouse as a homemaker. ORS 107.105(1)(f) (court shall consider contribution of spouse as homemaker). If a party ultimately rebuts the presumption that the other

---

"* * * * *

"(f)  For the division or other disposition between the parties of the real or personal property, or both, of either or both of the parties as may be just and proper in all the circumstances. * * * The court shall consider the contribution of a spouse as a homemaker as a contribution to the acquisition of marital assets. There is a rebuttable presumption that both spouses have contributed equally to the acquisition of property during the marriage, whether such property is jointly or separately held."

spouse contributed equally to a disputed marital asset, then the court decides how to distribute that marital asset without regard to any presumption and, instead, considers only what is 'just and proper in all the circumstances,' including the proven contributions of the parties to the asset. When a party has proved that a marital asset was acquired free of any contributions from the other spouse, however, this court has determined that, absent other considerations, it is 'just and proper' to award that marital asset separately to the party who has overcome the statutory presumption.

"After the court makes its preliminary determination of the appropriate division of the marital assets by applying the statutory presumption, ORS 107.105(1)(f) next requires that the court consider what division of all the marital property—that is, both the marital assets and any other property that the parties had brought into the marriage—is 'just and proper in all the circumstances.' By contrast to the focus upon the parties' respective contributions under the statutory presumption, the court's final inquiry as to the 'just and proper' division concerns the equity of the property division in view of all the circumstances of the parties. * * * The trial court's ultimate determination as to what property division is 'just and proper in all the circumstances' is a matter of discretion."

*Kunze*, 337 Or at 133-36 (citations omitted). The court also clarified that the question whether the spouses have commingled separately held assets is part of the court's application of the "just and proper" inquiry, and bears on the inquiry regarding comparative contribution only in circumstances in which assets have been so commingled as to render tracing impossible. *Id.* at 142.

B. *Husband's investment portfolio*

■     As related above, husband received an investment portfolio as a gift from his parents long before he met wife. When husband and wife began to live together, the portfolio was worth $330,353. At the time of their marriage, its value had appreciated to approximately $1,272,762. During the marriage, however, it lost value, and at the time of dissolution it was worth only $671,514. The trial court, applying the principle that appreciation of the portfolio during the parties' relationship, including their cohabitation, was a marital

asset to which the presumption of equal contribution applied, *see Massee and Massee*, 328 Or 195, 206, 970 P2d 1203 (1999), and finding that the presumption was not rebutted, ruled that the appreciation—$341,211 (based on the trial court's calculation)—should be divided evenly. In reviewing that determination under *Kunze* and subsequent cases, some of which were decided after the judgment in this case, we conclude that the trial court erred in several respects.

One error was focusing on the entire length of the parties' relationship, including both the period of cohabitation and the marriage, as the relevant period during which to measure the increase in the value of the portfolio. Undoubtedly, the court relied on a line of cases from this court indicating that "we consider the entire length of the parties' relationship and not simply the time during which they were legally married, so long as during that period of time there was mutual involvement, commingling and interdependence of finances." *Troffo and Troffo*, 151 Or App 741, 746, 951 P2d 197 (1997). However, after the judgment in this case, we held that *Kunze* tacitly overruled those cases and established that "the only relevant inquiry is when an asset was acquired; if it was acquired during the marriage, it is a marital asset, if it was acquired before the marriage, it is not, regardless of the nature of the parties' premarital relationship." *Timm and Timm*, 200 Or App 621, 628-29, 117 P3d 301 (2005). Thus, because the investment portfolio actually decreased in value during the relevant time period—the marriage—it did not generate any marital assets at all.

However, that conclusion is valid only if we consider the portfolio as a unit, comparable to a professionally managed mutual fund. That is not the correct way to view it. Unlike the holders of a mutual fund, husband actively managed his own portfolio. The trial court found, and we agree, that this management included the occasional purchase of new shares. The newly purchased shares are marital assets. We therefore must consider whether husband overcame the presumption that wife contributed equally to their acquisition.

We conclude that, under *Kunze*, husband overcame the presumption. The court found, and we agree, that husband deposited his employment income into two checking

accounts, one separate and one joint. He used those accounts to pay the mortgage and insurance on the parties' home and other household expenses. No employment income was used to buy additions to the portfolio. Thus, the additions were acquired using money from two other sources: from the $550 per month of portfolio dividends that husband typically reinvested, and from proceeds that husband realized from selling other holdings in his portfolio. Thus, all of the portfolio holdings that husband acquired during the marriage were generated by the portfolio itself. Put another way, they were all traceable back to the holdings that husband brought into the marriage as his separate property.

In that respect, the portfolio holdings were functionally equivalent to the Chaps Court property in *Kunze*. The equity in that property derived from the proceeds that the wife realized from the sale of a separate asset, the California duplex. *Kunze*, 337 Or at 145. The court held that, because the husband did nothing to contribute to the value of the California duplex before it was sold, he was not entitled to any of the equity in that asset and, more to the point here, he was not entitled to "the equity in the Chaps Court property attributable to the proceeds from the sale" of the California duplex. *Id.* The disputed equity in the Chaps Court property was a marital asset to which the presumption applied and was overcome. *Id.* at 144.

Likewise, in the present case, wife did nothing to contribute to the original acquisition of any component in husband's portfolio, nor did she contribute anything to the acquisition of the new shares that husband bought; the trial court found, and we agree, that "[h]usband maintained the investment portfolio. No interest was transferred to [w]ife. Wife had no authority to exercise any control over the investments or income from the investments. She did not participate in management of the portfolio." The court also found, and we agree, that "it was [h]usband's intent to keep the investment portfolio separate from any claim by [w]ife," and that "there is no evidence that supports the idea that, had the wife not worked, husband would not have been able to manage the portfolio." We therefore conclude that husband successfully rebutted the presumption of equal contribution with respect to the additions to the portfolio made during the

marriage. Further, because the new assets were "acquired free of any contributions from the other spouse," we conclude that it is "just and proper" for the entire asset to be regarded as husband's separate property. *Kunze*, 337 Or at 135. Although we would be free to reach a different conclusion if "other considerations" so dictated, *id.*, we find no such considerations.

The trial court also concluded that wife was entitled to a share of the appreciated value of the portfolio because some of that appreciation resulted from market forces. That conclusion, however, appears to flow from the premise that the portfolio did, in fact, appreciate. That premise, in turn, flowed from the presumption that the relevant period of measurement began with the parties' cohabitation. As we have discussed, the relevant period began with the parties' marriage, and, during that period, the value of the portfolio *decreased* significantly. We therefore find it unlikely that any particular component of the portfolio significantly appreciated during the marriage. If such appreciation did occur, it resulted from what the trial court characterized as "market forces" and not from husband's management efforts. Under *Kunze*, such passive appreciation in separately held assets is itself separately held. *Id.* at 143.

C.  *The Corvallis residence (lot and house)*

■         Husband purchased the Corvallis lot with $92,000 from his investment portfolio, and it was titled in only his name. He completed the purchase in February 1998, and the couple was married two months later. The lot therefore is not a marital asset, so we distribute it guided only by what is "just and proper" in the circumstances. *Id.* at 134. Because the purchase of the lot occurred so close in time to the marriage, after the parties had decided to marry, and in anticipation of building a marital home on it, we conclude that it should be distributed in the same proportion as the home itself. We refer to the lot and home as a unit, "the residence."

Husband's investment[4] in the residence was $192,000, consisting of the $92,000 that he contributed when

---

[4] The court in *Kunze* referred to the wife's "equity" in the Chaps Court property. In the context of the present case, the term "equity" could refer to the portion of the residence's value traceable to husband's payments from his portfolio, or to the "equity" in the residence, that is, its market value minus the outstanding

he bought the lot with premarital assets from his portfolio plus the $100,000 for a down payment and construction costs that he made from the same source. The parties' total investment in the residence at the time of dissolution was $220,000: then-present market value ($433,000) minus outstanding mortgage debt ($213,000). Because $192,000 of that came from husband's separate assets, it follows that the remaining $28,000 did not; rather, it came from either market appreciation or pay-down of debt. In either case, that latter amount is a marital asset and therefore subject to the presumption of equal contribution. *Massee*, 328 Or at 207. In the present case, husband does not vigorously contend that he has overcome the presumption with respect to that portion of the residence's value that does not derive from his separate assets. We therefore conclude that the $28,000 of the present value of the residence not attributable to husband's premarital investment should be divided equally.

Husband does, however, dispute the disposition of his $192,000 investment. Husband argues that he "made great efforts to keep the Corvallis house in his own name, to give wife no authority or input over the title, mortgage, or financing, and to build the house with only limited input from wife." Citing *Jenks and Jenks*, 294 Or 236, 241 n 2, 656 P2d 286 (1982), husband maintains that, even if wife did decorate and maintain the home while the parties lived there, that fact does not make his investment subject to the presumption of equal contribution. Wife, for her part, argues that her contributions as a homemaker and breadwinner are sufficient to trigger and sustain the presumption.

Although we do not wish to discount wife's efforts, the court's treatment of the Chaps Court property in *Kunze* suggests that, when a disputed piece of real property is purchased during marriage with proceeds from one party's separately held asset, that party rebuts the presumption of equal contribution as to that portion of the property's value traceable to those proceeds. *Kunze*, 337 Or at 145. The wife in *Kunze* sold property that she alone had inherited and,

---

mortgage. To avoid confusion, we refer to husband's separate payments as "husband's investment" in the residence and to the value of the residence to the parties at dissolution (market value minus mortgage) as "the parties' total investment."

together with the husband, used the proceeds from that sale to purchase the Chaps Court property during the marriage. The court concluded that the wife had rebutted the presumption of equal contribution with regard to her investment in the Chaps Court property. *Id.* Similarly, in the present case, husband invested in the Corvallis residence with funds derived from his separate portfolio. Although wife assisted in some nonfinancial aspects of the acquisition of that home, the money that husband used for the down payment, some construction costs, and the lot came entirely from the sale of husband's separately held assets. As a result, we hold that husband has rebutted the presumption of equal contribution with regard to his investment in the Corvallis residence and the trial court erred in concluding otherwise.

■    However, that conclusion does not end the inquiry. We must still determine how to divide the value of husband's investment in the house in a manner that is "just and proper in all the circumstances." ORS 107.105(1)(f); *Kunze*, 337 Or at 145. In doing so, we consider, in addition to the parties' relative contribution, a number of other factors. *Kunze*, 337 Or at 134-35. Most significantly for purposes of this case, we examine "the extent to which a party has integrated a separately acquired asset into the common financial affairs of the marital partnership through commingling." *Id.* at 136. Commingling, in turn, depends to a large extent on intent, that is, on

> "whether a spouse had intended to retain the separately acquired asset as separate property or whether, instead, that spouse's treatment of the separately acquired asset demonstrated an intent for that asset to become a joint asset of the marital partnership."

*Id.* at 141. Intent, then, depends not on what a spouse might privately contemplate or even publicly declare; it depends on how a spouse *acts*, that is, on what the spouse's "treatment" of the asset "demonstrate[s]."

    That is particularly true in cases described by one commentator as those "in which a spouse who owned separate property commits it to family uses, as when a house brought into the marriage becomes the family home." Leslie Joan Harris, *Tracing, Spousal Gifts, and Rebuttable*

*Presumptions: Puzzles of Oregon Property Distribution Law*,
83 Or L Rev 1291, 1300 (2004). Indeed, the court in *Kunze*,
337 Or at 139-42, cited cases involving separately acquired
houses that were deemed to be commingled because they
were used as family homes: *Jenks*, 294 Or at 242-43, and
*Seefeld and Seefeld*, 294 Or 345, 350-51, 657 P2d 201 (1982).
This court has demonstrated a similar tendency. *See, e.g.,*
*Niman and Niman*, 206 Or App 259, 268-70, 136 P3d 105
(2006); *Van Horn and Van Horn*, 185 Or App 88, 57 P3d 921
(2002), *rev den*, 335 Or 267 (2003). All of these cases are dis-
tinguishable from the present case in important respects,
but, together, they suggest that use of a separately acquired
house as a family home is powerful evidence (although cer-
tainly not dispositive) of commingling.

That, as we have noted, is what occurred in the pres-
ent case. Further, mortgage payments came from husband's
employment income, a marital asset. Wife contributed design
and construction ideas, and she had primary responsibility
for decorating the house when it was completed. She raised
her son in the house and, while also working and contribut-
ing to the family coffers, she maintained the home and cared
for the yard. From the time the parties married, wife clearly
regarded the house as a family home, regardless of the origin
of the funds used to purchase it and regardless of the fact that
husband's name alone was on the title—a fact of which wife
was unaware until several years after construction on the
home was completed. Additionally, although the parties did
not live in the residence for a long period, their nine-year
relationship was not short term. And although it is true that
husband presented wife with a prenuptial agreement that
would have prevented considering the home to be a marital
asset, the fact is that wife rejected that agreement and hus-
band married her anyway, thereby creating the inference
that he understood her to consider the home to be part of the
marital estate.

Considering all these circumstances, we conclude
that, although husband successfully rebutted the presump-
tion of equal contribution, it is just and equitable to divide
equally husband's investment in the Corvallis residence.

## III. SPOUSAL SUPPORT

█　　In his fourth and fifth assignments of error, husband argues that the trial court erred in awarding wife $500 per month in maintenance spousal support. Specifically, the trial court concluded:

> "An award of spousal maintenance is appropriate as said term is defined in ORS 107.105(1)(d)(C) for the following reasons: the duration of the premarital cohabitation and the marriage and the standard of living established, particularly since the parties moved into their present home. Wife will be unable to provide a standard of living for herself that approaches the standard enjoyed during the marriage. The court has also considered the needs and incomes of the parties and the property distribution."

Husband objects to the trial court's ruling, arguing that "there was no persuasive evidence that wife needed contributions from husband's earnings to support herself," wife is employed and "has the capacity to earn a good wage," and cohabitation should not be a factor in determining spousal support.

█　　ORS 107.105(1)(d)(C) provides a nonexhaustive list of factors that the court may consider in deciding upon an award of spousal maintenance:

> "(i)　　The duration of the marriage;
>
> "(ii)　　The age of the parties;
>
> "(iii)　　The health of the parties, including their physical, mental and emotional condition;
>
> "(iv)　　The standard of living established during the marriage;
>
> "(v)　　The relative income and earning capacity of the parties, recognizing that the wage earner's continuing income may be a basis for support distinct from the income that the supported spouse may receive from the distribution of marital property;
>
> "(vi)　　A party's training and employment skills;
>
> "(vii)　　A party's work experience;
>
> "(viii)　　The financial needs and resources of each party;

"(ix)  The tax consequences to each party;

"(x)  A party's custodial and child support responsibilities; and

"(xi)  Any other factors the court deems just and equitable."

Although we agree with husband that the statute plainly refers to "duration of the marriage" as one factor that the court may consider in determining an award of spousal maintenance, we note that the statute's final subsection gives the court broad discretion to consider other factors that "the court deems just and equitable." We see no reason why that discretion necessarily excludes considering the length of the parties' premarital cohabitation. In the present case, we note that, during cohabitation, wife contibuted all of her earnings to household expenses. Further, as the trial court found, "During the period of premarital cohabitation, the parties did not view their financial relationship as merely sharing expenses. They soon recognized that they were a family and, eventually, that they would marry. They conducted themselves as a married couple." To the extent that the court used the period of cohabitation in determining spousal support, it did not err.

Moreover, we have noted previously that "[n]o one factor is dispositive." *Arand and Arand*, 182 Or App 368, 374, 49 P3d 799 (2002). The trial court in the present case listed a variety of reasons for its award, and even noted that the standard of living that the parties had established since moving into the Corvallis residence was a key factor in its decision. Indeed, the parties' standard of living significantly improved after they were married, thereby diminishing the importance of their premarital cohabitation as a factor in the spousal support award.

Other factors include the standard of living that the couple established during the marriage, ORS 107.105(1)(d)(C)(iv), and the parties' respective financial needs and resources, ORS 107.105(1)(d)(C)(viii). During most of the marriage, the parties lived in a large custom home valued at $433,000 and apparently had a good deal of disposable income. At the time of dissolution, husband's income from

employment and his portfolio was $5,831 per month; wife's was $2,312. On that income, wife could not approximate the standard of living she had during the marriage. We conclude that the trial court's support order—again, $500 per month, which, we note, ends once husband has paid wife the equalizing judgment, thereby enabling her to consider purchasing a modest home—was fair and equitable.

## IV. ATTORNEY FEES

In his final assignment of error, husband asserts that the trial court erred in awarding attorney fees to wife. Citing *McCarthy v. Oregon Freeze Dry, Inc.*, 327 Or 185, 957 P2d 1200 (1998), he argues that "[t]he court is required to explain the relevant facts and legal criteria it used in awarding or denying an award of attorney fees, even in dissolution cases." In *McCarthy*, the Supreme Court noted that

> "[e]fficient and meaningful appellate review for abuse of discretion cannot occur on the present record, because we can only speculate about the possible relevant facts and legal criteria relied on for the court's award of attorney fees. Adequate findings about those matters need not be complex or lengthy. Rather, they must describe the relevant facts and legal criteria for the court's decision to award or deny attorney fees in any terms that are sufficiently clear to permit meaningful appellate review."

327 Or at 190-91. In its letter opinion to the parties in the present case, the trial court explained its decision to award attorney fees to wife as follows:

> "In the July 12, 2004, opinion letter, the court's intent, obviously inadequately expressed, was that husband would be required to contribute toward wife's attorney fees and costs * * *.

> "Husband does not object to the hourly rate claimed by wife's attorney nor does he allege that wife's attorney did not perform services claimed to have been performed. The court finds accordingly. The court also finds that the services performed by wife's attorney were reasonably necessary.

> "Husband's objection is that it would be unreasonable for him to be required to contribute to wife's attorney fees considering the division of property between the parties.

> "Having considered the lack of dispute over hourly rates of [wife's attorney] and services performed and the arguments of the parties, the court finds that wife shall have a judgment against husband in the amount of $3,000 attorney fees and $206 costs."

The court's opinion isolates husband's objection—that, in light of the property division, it is not reasonable for wife to receive any attorney fees—and rejects it in unambiguous terms. That is sufficient under *McCarthy*.

In sum, we conclude that the trial court erred in its treatment of husband's investment portfolio and of the Corvallis residence. The court treated "the current value of the portfolio, $671,564, less $330,353, that is, $341,211 plus the $220,000 equity in the residence, total $561,211, as appreciation to the portfolio that occurred during the cohabitation and marriage as marital assets subject to distribution." The trial court also awarded wife an equalizing judgment in the amount of $30,282.50 to account for other assets; husband does not contest that award. We have concluded that none of the investment portfolio is a marital asset; regarding the Corvallis residence, we agree with the trial court, albeit for different reasons, that $220,000 of its value is subject to equal division. It follows that wife should be awarded a judgment of $140,282.50, representing her share of the Corvallis residence plus the uncontested equalizing judgment. In all other respects, the judgment of the trial court is affirmed.

Judgment of dissolution modified to award wife $140,282.50; otherwise affirmed.

**MITCHELL, J. pro tempore,** concurring in part, dissenting in part.

I concur with the majority opinion in every respect except its treatment of husband's initial contribution of $192,000 to the acquisition of the Corvallis residence. I agree that husband rebutted the presumption of equal contribution as to that asset, but I cannot conclude that those funds were integrated into the common financial affairs through commingling such that a just and proper distribution requires that wife be awarded half. Therefore, I respectfully dissent.

Where a party rebuts the presumption of equal contribution, that party *"presumptively* is entitled to receive [that asset] separate from the property division unless other considerations *require* a different result." *Kunze and Kunze,* 337 Or 122, 145, 92 P3d 100 (2004) (emphasis added). If a party seeks to bring the asset into the property division because of commingling, "the court's inquiry properly focuses upon whether a spouse demonstrated an intent to retain that spouse's separately acquired asset as separate property or whether, instead, that spouse intended for that property to become the joint property of the marital estate." *Id.* at 142. Evidence of intent may include "(1) whether the disputed property was jointly or separately held; (2) whether the parties shared control over the disputed property; and (3) the degree of reliance upon the disputed property as a joint asset." *Id.* at 141.

If the court concludes that a spouse intended the property to become the joint property of the marital estate, that does not necessarily require inclusion of the asset in the property division. The court must further evaluate

"the extent to which a spouse has integrated a separately acquired asset into the joint finances of the marital partnership and also evaluate whether any inequity would result from the award of that asset to that spouse as separate property."

*Id.* at 142. For the following reasons, I do not agree that husband demonstrated an intent that his initial contribution become a marital asset. Nor do I see any inequity to wife from returning that asset to husband as his separate property.

Husband's intent here could hardly be more obvious. The residence was titled in his name only. He used only his separate funds to purchase the lot and make the down payment on the construction loan. He financed the balance of the construction loan secured only by his portfolio. He alone was obligated to repay the loan. When he refinanced the loan using the house as security, only he was obligated on that loan. Although the parties used a joint account for household purposes, he made the mortgage payments out of his separate account. He paid the property taxes only out of earnings from his separate portfolio funds. There is no evidence that

wife participated in any of those decisions or otherwise exercised any control over the finances relating to the house. If husband's conduct did not manifest an intent to keep his equity as a separate asset, it is hard to imagine what else he could have done, short of requiring a prenuptial agreement, to manifest such an intent.[1]

The majority's analysis of husband's intent does not address the three factors described in *Kunze*: title, control, and reliance. Those factors do not support the majority's conclusion: (1) The property was titled only in husband's name; (2) wife exercised no control over the financial aspects of the property; and (3) there is no evidence that wife relied on husband's contribution to the marital residence as a joint asset. Indeed, the only evidence bearing on husband's intent (other than the inference arising from husband's marrying wife notwithstanding her refusal to sign a prenuptial agreement) is the fact that husband used his separate funds to finance the marital residence rather than investing them elsewhere. He could have left them in the portfolio account, in which case wife would share in neither the funds nor the appreciation. There are many factors that might have motivated his investment in a home: he and wife needed someplace to live; housing is generally a good investment; there are favorable tax consequences from homeownership; and contributing his separate assets would allow the couple to live in a more desirable house than they could otherwise afford using only their joint assets and income. No doubt there are other reasons as well. Given the presumption that husband is entitled to return of those funds, together with his overt efforts to maintain them as his separate property, the mere fact that the funds were invested in the marital residence does not reasonably demonstrate an intent to share them with wife.

I conclude that husband has demonstrated an intent to retain his initial contribution as separate property. Therefore, if that property is to be included in the property distribution, it must be based on some equitable consideration

---

[1] The majority infers, because wife refused to sign a prenuptial agreement and husband married her anyway, that husband intended his initial contribution to become the joint property of the marital estate. In light of husband's request for the prenuptial agreement in the first place and his efforts to maintain the contribution separately during the marriage, the inference, even if reasonable, is dwarfed by evidence to the contrary.

other than commingling. *See id.* at 135-36 (nonexclusive list of equitable considerations). As no other consideration has been identified here, that conclusion should end the inquiry.

Even if the court concluded that husband had integrated his initial contribution into the common financial affairs of the marital partnership through commingling, it must still evaluate the extent to which the asset has been integrated into the joint marital finances. The majority has not identified any impact, adverse or otherwise, to the marital finances. There is no evidence of "shared financial decisions during the marriage * * * made in reliance [on] that asset without consideration to whether it was separately or jointly acquired." *Id.* at 140. Husband's contribution is readily identifiable and directly traceable to his portfolio account. Except for its use to acquire the marital residence, it does not appear to have been integrated into the joint finances in any significant way.

Finally, the court must evaluate "whether any inequity would result from the award of that asset to that spouse as separate property." *Id.* at 142. The majority notes that wife raised her son in the house and regarded the house as a family home. It does not follow that wife must now be compensated by husband as a result of her use of the house and her feelings toward it. The majority notes that wife contributed design and constructions ideas, decorated the house when it was completed, maintained the home, and cared for the yard. As with the Germantown Road property in *Kunze,* wife's efforts during the marriage to improve the property may have contributed to its increase in value, but they did not affect husband's initial contribution. *See id.* at 145. Similarly, the fact that mortgage payments came from husband's income has little bearing on his initial contribution.

I disagree with the majority's statement that the houses in *Jenks and Jenks,* 294 Or 236, 656 P2d 286 (1982), and *Seefeld and Seefeld,* 294 Or 345, 657 P2d 201 (1982), "were deemed to be commingled *because they were used as family homes*[.]" 207 Or App at 68 (emphasis added). The court in *Kunze* cited those cases as illustrating the application of the equitable consideration that "the more integrated the parties' finances become during the course of a marriage,

the less significant is the origin of each asset in fashioning the 'just and proper' division of the marital property at dissolution." *Kunze*, 337 Or at 140. In *Jenks*, the husband brought into the marriage a "dilapidated farmhouse * * * that had blackberry vines in the stairways and rats in the attic." 294 Or at 238 (internal quotation marks omitted). The parties took out a loan in both their names to remodel the residence. They contributed their joint labor and expenditures to convert the house into a comfortable residence. They used the residence as security in the joint purchase of an adjoining 97 acres. The parties' four children had grown up in the residence. *Id.* at 242-43. The wife was awarded "residential custody" of the children conditioned on her remaining in the vicinity of the residence. *Id.* at 239. In *Jenks*, there was joint control of the property, extensive integration into the joint finances of the parties, and the inequity of requiring the children to move out of their lifelong residence while requiring them to remain in the vicinity of it.

*Seefeld* is more a child support case than a commingling case. The husband contributed $11,300 from his premarital assets to the purchase of the marital residence, which the parties held jointly. *Seefeld*, 294 Or at 347 n 1. In awarding the home to the wife, the court observed that, as the custodial parent, the wife had the responsibility of providing a home for the child. It concluded that, given the husband's income, he could not provide adequate financial support without liquidating his assets. *Id.* at 351-52. Accordingly, it affirmed the trial court's award of the equity in the residence to the wife, with one modification: It awarded the husband a judgment lien against the home in the amount of $10,000 because he "should realize some return on his investment in the family home." *Id.* at 352.

Under the *Kunze* paradigm, husband's initial contribution should be returned to him. The court in *Kunze* awarded the husband a share in the wife's initial contribution in the Chaps Court property based on two considerations: "Wife purchased the * * * property jointly with husband in tenancy by the entirety, and * * * she introduced no evidence at trial that showed that she had intended to retain her separately acquired equity in that property as her separate property." *Kunze*, 337 Or at 146-47. Conversely, the husband was awarded none of the premarital equity in the

Germantown Road property even though the property was jointly titled, it had served at one time as the marital residence, income from the property was deposited into a joint account and expenses were paid from the same account, and the husband "provided considerable labor, planning, and management services" and "remodeled, painted, and performed improvements and repairs on the property." *Kunze and Kunze*, 181 Or App 606, 618, 47 P3d 489 (2002), *aff'd as modified*, 337 Or 122, 92 P3d 100 (2004).

In the present case, the circumstances are qualitatively different from those in *Jenks*, *Seefeld*, the Chaps Court analysis, and even the Germantown Road analysis. Given the presumption that husband is entitled to the return of his initial contribution, none of the circumstances described by the majority requires him to pay wife $96,000 simply because he invested $192,000 in the marital residence rather than leaving it in his portfolio account.