Argued and submitted November 16, 2010, judgment modified to award wife an equalizing judgment of $2 million; attorney fee decision vacated and remanded for reconsideration; otherwise affirmed March 14, petition for review denied July 19, 2012 (352 Or 266)

In the Matter of the Marriage of

Douglas Randall WOLFE,
*Petitioner-Respondent,*

*and*

Gillian Heath WOLFE,
*Respondent-Appellant.*

Benton County Circuit Court
0630328; A139934

273 P3d 915

George W. Kelly argued the cause and filed the briefs for appellant.

John L. Barlow argued the cause for respondent. With him on the brief was Barnhisel Willis Barlow & Stephens, PC.

Before Haselton, Presiding Judge, and Brewer, Chief Judge, and Duncan, Judge.*

HASELTON, P. J.

* Brewer, C. J., *vice* Gillette, S. J.

## HASELTON, P. J.

Wife appeals a general judgment of dissolution, contending that the trial court erred in (1) awarding husband his interest in a family trust and two investment accounts valued at $10.3 million as his separate property;[1] (2) setting the duration and amount of maintenance spousal support; and (3) denying her request for attorney fees before reviewing it. On *de novo* review, ORS 19.415(3) (2007),[2] we modify the trial court's property division because, although husband rebutted the presumption of equal contribution with regard to the disputed property, it is just and proper for wife to receive an equalizing judgment of $2 million. Further, in light of our modification to the property award, we reject wife's contentions concerning spousal support and vacate the trial court's decision concerning attorney fees. Accordingly, we modify the judgment to award wife an equalizing judgment of $2 million and vacate and remand the attorney fee decision for reconsideration but otherwise affirm.

Although our review is *de novo*, we defer to the trial court's express and implied credibility findings. *Tomos and Tomos*, 165 Or App 82, 87, 995 P2d 576 (2000). Here, husband contends that the trial court's disposition of the disputed property was predicated on credibility findings and that, "[w]here Husband's testimony differs from Wife's on material issues, [we] should accept the trial court's explicit and implicit findings that Husband's account was more credible than Wife's." As we explained in *Olson and Olson*, 218 Or App 1, 3, 178 P3d 272 (2008), "[w]e take a cautious approach in that regard because, beyond its express findings, we cannot discern to what extent the trial court's decision may have depended on implied findings of fact." For that reason, "we defer only to credibility determinations that the trial court necessarily made in connection with its express findings of fact." *Id.*

---

[1] Throughout this opinion we refer to those three assets collectively as "the disputed property."

[2] ORS 19.415 was amended in 2009 to make *de novo* review discretionary in domestic relations cases. Or Laws 2009, ch 231, § 2. Those amendments apply to appeals in which the notice of appeal was filed on or after June 4, 2009. Or Laws 2009, ch 231, § 3. Because the notice of appeal in this case was filed before that date, we apply the 2007 version of the statute, which provides for *de novo* review.

This case involves a long-term marriage of over 30 years. At the time that the marriage was dissolved, husband was a 63-year-old ophthalmologist practicing in the Corvallis area, and wife was a 60-year-old homemaker and bookkeeper living in California. The parties have two adult children.

As general background, husband and wife met in 1974 while husband was completing his internship and wife, who was a nurse practitioner, was working at the same hospital.[3] After the parties married in 1975, husband completed his residency and fellowships, one of which took them to London for a little over a year. When the parties returned from London in 1980, they moved to Corvallis, where they lived until they separated in 2006.

Initially, husband worked for a clinic in Corvallis, and wife worked as a nurse practitioner for the county health department. In 1980, the parties purchased a farm, and, in 1982, about the time that their daughter was born, they moved into the home that they had recently built there. Although wife planned to continue working in her profession, by the time that the parties' son was born in 1983, she chose to be a homemaker rather than to continue working as a nurse practitioner.

However, in addition to her homemaking responsibilities, wife also managed the parties' farm, which was set up as a business so that they could contribute to an individual retirement account for wife. Specifically, wife explained:

"I was a full-time parent for these two children, I was also an accomplished seamstress so I upholstered our furniture, I made our window coverings, I painted, I wallpapered, I cooked, I cleaned, I carpooled. I was totally involved in all their activities, I was in charge of—volunteered in their schools, I was the after school enrichment coordinator at their schools, I was on all the boards and committees within their schools, followed all their activities. I was president of * * * the Benton County Medical Society Alliance which was supporting physicians and teaching health education in the community, I belonged to the Assistance League,

---

[3] Wife had a clinical teaching position at the University of San Francisco School of Nursing and was working as a private duty nurse at the hospital to learn about the latest technology.

other philanthropic organizations.[4] We had as I said a 78 acre farm. We developed a herd of 22 cows and a bull, we had chickens and ducks, we had to grow and maintain hay, we had Christmas trees at one time which we did have a manager doing that and I oversaw him and the trees and the sale and the fertilizer and the grooming of those trees[.]"

Wife considered reentering the workforce in 1991.[5] However, when husband decided to leave the clinic and open his own medical practice, wife became directly involved in its operation. As wife explained,

"in the beginning I hired the help, I bought the supplies, I set up the bookkeeping, I conferred with the accountant about what I needed to do, I conferred with other people as far as what was necessary for a business as far as office policy manuals, what should be in it, what were the legal ramifications and necessity things. I then worked in the office and worked doing the bookkeeping and the payroll, * * * recruited, hired, trained, supervised the employees, developed a team approach with a mission statement so that * * * what we offered different from Costco or any of those other places was service, quality of service, so I worked with them very carefully to make sure that that was carried out, that we had a high standard of quality, and so interfaced with the community, going to small business meetings within the community to promote our institution and to learn how to do in the highest quality possible, and when our employees were sick or on vacation or getting married or some other thing then I actually physically was the nurse or was the front office person or helped fix broken glasses or took contact lens prescriptions, refills or whatever, did the pre-exam for my husband."

Despite wife's significant contributions to the ophthalmology practice, for many years, she did not draw a salary in order to, as husband noted, "better [their] tax situation." Specifically, husband explained that, on the advice of the parties' accountant, wife did not draw a salary so that the

---

[4] Wife further noted that participation in those philanthropic organizations is a networking opportunity "for who's who in Corvallis" and that "many of our patients came directly through those contacts."

[5] Specifically, wife was in the process of applying for a position at Oregon State University's student health center.

parties would not have to pay Social Security and Medicare taxes related to her work in the practice. That arrangement, in turn, maximized the amount of husband's earnings that were ultimately deposited into joint accounts and used for family purposes. In other words, husband's earnings effectively included wife's compensation for her contributions to the ophthalmology practice. However, for a few years immediately preceding the parties' separation in 2006—after the tax laws had changed and the practice modified its retirement plan—wife drew enough salary to maximize her retirement contributions to that plan.

According to husband, after the parties separated in 2006, he "couldn't keep the books and do all the billing and everything in our practice." Ultimately, in 2007, husband's practice was purchased by another physician.

At the time of trial, husband continued working part time for that physician, earning approximately $11,000 per month, and wife was employed part time as a bookkeeper, earning approximately $2,300 per month. However, wife planned to retire in the near future, and husband planned to retire within a couple of years.

By all accounts, the parties had a very comfortable, but not overly extravagant, standard of living during the marriage. Husband noted that he and wife "really never talked about money." As wife explained, "[m]oney wasn't a problem" and she could make "[a]ny purchases that [she] want[ed]." In fact, through their efforts, the parties acquired assets—including real property[6] and retirement and investment accounts—worth approximately $5 million at the time of trial.

The parties' standard of living was supported primarily through the income generated by the medical practice and the parties' joint investments. However, husband had

---

[6] By the time of trial, the parties had purchased a residence in Corvallis because the home that they had built on the farm had burned down, destroying their possessions and financial documents. The parties also owned other pieces of real property, including a vacation home and a $1.2 million residence in California that wife purchased after the parties had separated, which was encumbered with mortgages of over $900,000.

other assets—that is, the disputed property—that he would periodically use to supplement that income.

Because the nature and ultimate division of the disputed property is the focus of the parties' contentions on appeal, we describe it in some detail. In particular, at the time of trial, husband had an interest in the EFLOW trust as well as two investment accounts—which we refer to as "the Smith Barney account" and "the UBS account."[7] As explained below, all three of those assets originated from a single source—*viz.*, a devise of, *inter alia*, stocks, bonds, and real property from husband's grandfather, who died in the 1950s when husband was a child.

In particular, on his death, husband's grandfather left, as pertinent here, certain stocks, bonds, and real property to husband's father to hold in trust for the use and benefit of husband and his two siblings. Husband's father managed the property held in the testamentary trust, and, at some point, placed husband's earnings in an investment account in husband's name. Although husband's interest in the testamentary trust was to terminate when he reached 25 years of age—that is, approximately five or six years before the parties' marriage—our understanding is that the trust did not terminate and husband's father continued to manage the trust property.

At the time of the parties' marriage in 1975, husband "knew that there was some family money there" (*i.e.*, in the testamentary trust) but he did not know the extent of that money. Moreover, before the marriage, husband and wife had not discussed their individual financial interests, generally, or the value of husband's interest in the testamentary trust, specifically.

Several years after the parties' marriage, three significant events relating to the assets of the testamentary trust occurred. *First,* in 1981, the EFLOW trust was created.

---

[7] The parties in this case had other investment and retirement accounts with UBS and Smith Barney. To avoid misunderstanding, for purposes of this opinion, "the Smith Barney account," "the UBS account," and "the EFLOW trust" refer, respectively, to the assets listed at lines 40, 38 and 39, and 80 to 83 of the trial court's asset distribution spreadsheet, which was incorporated into the dissolution judgment as an exhibit.

The EFLOW trust document indicates that (1) husband and his parents and siblings transferred their interests in several pieces of real property to the EFLOW trust and (2) "[c]ertain property interests listed [in the trust document were] already held by [husband's father] for the benefit of himself, and [his children] in his capacity of Trustee of other trusts." *Second*, in 1983, husband's father transferred to husband the investment account into which husband's earnings from the testamentary trust had been placed. That account became the Smith Barney account. Husband's initial investment in the Smith Barney account was approximately $50,000. *Third*, at some point after the Smith Barney account was opened in 1983, husband withdrew some money and opened the UBS account.

The disputed property—that is, the EFLOW trust and the Smith Barney and UBS accounts—was essentially managed by third parties. With regard to the EFLOW trust, husband's father, as trustee, managed the trust assets— without any assistance from husband or wife—until his death in 2004. Although there had been family discussions concerning the EFLOW trust over the years, husband and wife knew little about husband's father's management of the trust assets or the value of husband's interest in them.[8] With regard to the investment accounts, which were in husband's name only, husband essentially left their management to others. Specifically, Schupp, an investment advisor, managed the Smith Barney account from its inception until a few months before trial, and Lipps, one of husband's college roommates, who had become a financial advisor, managed the UBS account.

Earnings from the disputed property were reinvested. Significantly, none of the parties' earned income was ever invested in the disputed property.[9] To the extent that

[8] In fact, after husband's father died in 2004, husband—and wife until the parties separated in 2006—spent a great deal of time attempting to learn about the EFLOW trust assets and their management and, eventually, took over the management of the trust. Compensation for those efforts was placed into separate accounts—the division of which is not at issue on appeal.

[9] We also note that, during the marriage, the parties filed joint tax returns. To the extent that the parties incurred tax liability that was attributable to the disputed property itself, husband satisfied that liability with funds from the Smith Barney account.

the disputed property appreciated in value during the marriage, that appreciation was passive and did not result through the efforts—either direct or otherwise—of husband or wife.[10]

During the marriage, husband periodically used funds from what he referred to as his "separate money"— which included the Smith Barney account—to supplement the parties' earned income. Most substantially, husband used that money to (1) help finance the acquisition of the parties' farm and the construction of their home; (2) annually make maximum contributions to both parties' individual retirement accounts; and (3) pay for some incidental vacation expenses. Husband's use of those funds within his control occurred in an overarching context in which the parties generally made financial decisions together based on what was in the best interests of their family.

Beyond husband's direct application of funds from his "separate money" for joint family purposes, the existence of husband's interest in the disputed property influenced—at least to some extent—financial decisions during the course of the marriage. For example, a few years after the parties married, husband decided that he no longer needed life insurance because, if he had died, his wife and children would have received the benefit of all of his assets—including the disputed property. Further, as husband testified:

"In the early days by virtue of having potentially the other money I was able to make maximal contributions at a time when say some of my compatriots were having to not put as much money into their retirement funds as we could. I

---

[10] Wife testified, contrary to husband's account, that, during the marriage, she and husband were involved in the management of the disputed property. However, the trial court found that either husband's father or husband managed the disputed property. Further, on *de novo* review, with regard to the investment accounts, we find that any management by husband was extremely limited. Husband testified that he "had nothing to do with" the UBS account and that his involvement with the Smith Barney account was limited. In particular, with regard to the Smith Barney account, husband had a long-term investment philosophy in which he preferred to buy and hold stocks and he would occasionally suggest the purchase of particular stocks. Thus, consistently with the trial court's finding, we find that the increase in value of the disputed property occurred independently of the parties' efforts.

could always make a maximal contribution, you know, because I could draw on that other money if we had to."

It was against that historic and financial backdrop that the parties framed their respective positions concerning the division of property and spousal support to the trial court. With regard to the property division, the parties were in general agreement that, other than husband's interest in the disputed property, the remaining $5 million in property should be divided equally between them. Thus, their contentions in the trial court focused on the disputed property.

In that regard, wife contended that (1) husband's interest in the disputed property was a marital asset; (2) husband had not rebutted the presumption of equal contribution with regard to that property in light of wife's contributions to the ophthalmology practice and as a homemaker; and (3) in all events, a just and equitable division "dictates that the parties in this case leave the marriage on equal footing." Wife also requested spousal support—the amount of which would "depend on the court's determination of how the assets are to be divided."

Conversely, husband contended that the disputed property was a premarital asset because it originated from the devise from his grandfather in the 1950s. Alternatively, husband contended that, to the extent that a portion of the disputed property was a marital asset, he had rebutted the presumption of equal contribution by demonstrating that the disputed property was managed by third parties and that any appreciation was essentially passive. In all events, husband contended that it was just and equitable to award him the $10.3 million in disputed assets because he had intended to retain them as his separate property and because the assets were not sufficiently commingled into the parties' financial affairs. In terms of spousal support, husband contended that an award was unnecessary because the property division, without reference to the disputed property, would generate sufficient income to enable wife to be economically self-sufficient and to enjoy a standard of living not overly disproportionate to the one that the parties enjoyed during the marriage.[11]

---

[11] Husband's contention in that regard was supported by the testimony of a financial planner. That witness testified that, if wife invested an award of

In the dissolution judgment, the trial court awarded wife approximately $2.6 million in assets, and awarded husband approximately $2.4 million in assets. Further, the trial court awarded husband the disputed property valued at $10.3 million as his separate property.[12]

The court explained that, "[e]ven though [its] distribution of marital assets is not equal, it is just and equitable" in light of "all [the] circumstances," noting that "Wife will not be required to pay an equalizing judgment to Husband in any amount." Further, with regard to its award of the disputed property to husband, the court explained:

> "The joint assets of the marriage are substantial and will allow each party to be economically self-sufficient. Husband inherited and owns interest in several family trusts which have been invested and managed by Husband's father and recently by Husband. Rental income from real property and dividend and interest earnings from separate accounts have been reinvested in the original investments. Maintenance and taxes on the properties and investments have been paid from separate accounts. The increase in value of Husband's inherited property is due to market appreciation, independent of the efforts of Husband and Wife. Husband has rebutted the presumption of equal contribution of Wife relating [to] these assets and it is just and proper to award these assets to Husband."

With regard to spousal support, the trial court determined that wife was entitled to support until she reached full retirement age. For that reason, the court awarded wife maintenance support of $2,000 per month for two years, followed by $1,000 per month for three years thereafter.

Finally, over wife's objection, the trial court determined that each party was responsible for his or her respective attorney fees and costs and disbursements. Wife appeals.

---

approximately $2.6 million in assets, she could—depending on whether she wanted to leave the principal intact—generate annual, disposable income of $112,000 to $127,000 (inclusive of Social Security benefits), with corresponding annual increases of 3.2 percent for inflation.

[12] The Smith Barney account valued at approximately $4.9 million and the UBS account valued at approximately $5.1 million comprised the bulk of the $10.3 million. Husband's interest in the EFLOW trust was valued at approximately $340,000.

On appeal, wife raises three assignments of error which, respectively, are predicated on the following contentions: (1) The trial court erred in awarding the $10.3 million in disputed assets to husband. (2) The trial court erred in the amount and duration of its award of maintenance spousal support, which, wife contends, should be increased to $10,000 per month indefinitely. And (3) the trial court erred in denying her request for attorney fees before reviewing it.

We begin with the property division. Our resolution of that matter is guided and circumscribed by ORS 107.105(1)(f) (2007),[13] as construed in *Kunze and Kunze*, 337 Or 122, 92 P3d 100 (2004).

ORS 107.105(1)(f) (2007) provided, in part:

"Whenever the court renders a judgment of marital annulment, dissolution or separation, the court may provide in the judgment:

"* * * * *

"(f)   For the division or other disposition between the parties of the real or personal property, or both, of either or both of the parties as may be just and proper in all the circumstances. * * * The court shall consider the contribution of a spouse as a homemaker as a contribution to the acquisition of marital assets. There is a rebuttable presumption that both spouses have contributed equally to the acquisition of property during the marriage, whether such property is jointly or separately held."

Under the statute, our initial inquiry is to determine when a disputed asset was acquired. As we explained in *Hanscam and Hanscam*, 247 Or App 207, 216, 268 P3d 715 (2011),

---

[13] ORS 107.105(1)(f) was amended in 2011 to provide that a gift—including a devise—that is acquired by one spouse during the marriage and separately held by that spouse thereafter is not subject to the presumption of equal contribution. Or Laws 2011, ch 306, § 1. That amendment applies to "domestic relations proceedings pending or commenced on or after" January 1, 2012. Or Laws 2011, ch 306, § 2. Because husband received the pertinent devise from his grandfather decades before the parties married in 1975, the 2011 amendment is inapposite here. For that reason, we need not decide whether the 2011 amendment to ORS 107.105(1)(f) applies to a dissolution judgment that is on appeal. Accordingly, we apply the 2007 version of ORS 107.105, which was in effect when the trial court entered its judgment.

"[i]f the asset was acquired during the marriage, we apply the statutory presumption, unless either party has rebutted it. *Kunze*, 337 Or at 134. If the presumption of equal contribution is effectively rebutted,

" 'then the court decides how to distribute that marital asset without regard to any presumption and, instead, considers only what is "just and proper in all the circumstances," including the proven contributions of the parties to the asset. *Massee* [*and Massee*, 328 Or 195, 205, 970 P2d 1203 (1999)].'

"*Kunze*, 337 Or at 135."

(Second brackets in *Hanscam*.) Accordingly, we begin by determining whether and to what extent husband's interest in the disputed property was acquired during the marriage—that is, whether and to what extent the disputed property is a "marital asset" to which the presumption of equal contribution applies.

Although that inquiry is straightforward in many cases, it is not here. On this record—candidly—it is impossible to make that determination with any degree of precision.

As previously indicated, 248 Or App at 588, the disputed property originated from a devise from husband's grandfather in the 1950s. However, on this record, we cannot ascertain the specific configuration or "mix" of devised property in which husband had an interest at any time after its original acquisition—including at the time of the parties' marriage in 1975—nor can we know the value of that property.

Moreover, after the parties married, the configuration of property was continually evolving. For example, our understanding is that real property was commonly sold or exchanged, and new properties were acquired. New stocks were purchased, and others were sold. Although it is clear that there was significant appreciation in the Smith Barney and UBS accounts during the marriage and that earnings from the disputed property were reinvested, the record does not disclose when earnings were distributed, the amount of those earnings, or their disposition (*e.g.*, acquisition of new stock or real property). *See Massee*, 328 Or at 197 (holding

that appreciation of a separately held premarital asset during the marriage is a marital asset); *see also Lind and Lind,* 207 Or App 56, 63, 139 P3d 1032 (2006) (holding that marital assets include new shares in an investment portfolio that are purchased during the marriage). Thus, we are unable to precisely determine the extent to which the disputed property is a marital asset or, concomitantly, to quantify its corresponding value.

Nevertheless, at least, it is patent that wife did not contribute to the initial devise of property to husband from his grandfather decades before the parties' marriage. Moreover, and in all events, to the extent that some portion of the disputed property is, doubtless, a marital asset, husband rebutted the presumption of equal contribution. That is so for two interrelated reasons.

First, the earnings from the disputed property were reinvested, and none of the parties' earned income was deposited into the Smith Barney or UBS accounts. Under those circumstances, husband's entire interest in the disputed property at the time of trial is traceable to his premarital interest in the property. *See Lind,* 207 Or App at 64 (where the husband acquired an investment portfolio before the marriage and where "all of the portfolio holdings that [the] husband acquired during the marriage were generated by the portfolio itself" and "traceable back to the holdings that [the] husband brought into the marriage as his separate property[,]" the husband had rebutted the presumption of equal contribution).

Second, to the extent that a portion of the disputed property is a marital asset—through either the acquisition of new property or appreciation—neither husband nor wife contributed to the acquisition of that property during the marriage. Instead, the disputed property was essentially managed by third parties, who reinvested the earnings. Under those circumstances, the acquisition of new property and the appreciation during the marriage occurred passively and independent of any contribution of either husband or wife.[14]

_____

[14] Wife emphasizes that, during the marriage, she was the primary caretaker of the parties' two children, contributed to the family's earned income, and gave uncompensated time to managing husband's ophthalmology practice. However,

*See Kunze*, 337 Or at 135 (reasoning that the presumption of equal contribution is rebutted with regard to the acquisition of a marital asset "[w]hen a party has proved that a marital asset was acquired free of any contributions from the other spouse"); *id.* at 143 (holding that the presumption of equal contribution may be overcome by evidence that the appreciation of a marital asset was passive—that is, that the property required "minimal attention from either of the parties during the marriage" and the appreciation involved no contribution by either spouse).

Accordingly, husband has rebutted the presumption of equal contribution as to any portion of the disputed property that is a marital asset. We proceed then to determine "how to apportion the property in a manner that is just and proper in all the circumstances." *Olson*, 218 Or App at 11 (internal quotation marks omitted).

In *Kunze*, the Supreme Court explained that,

"[b]y contrast to the focus upon the parties' respective contributions under the statutory presumption, the court's final inquiry as to the 'just and proper' division concerns the equity of the property division in view of all the circumstances of the parties."

337 Or at 135. The equitable considerations that guide a court include (1) "the social and financial objectives of the dissolution"; (2) "the preservation of assets"; (3) "the achievement of economic self-sufficiency for both spouses"; (4) "the particular needs of the parties and their children"; and (5) "the extent to which a party has integrated a separately acquired asset into the common financial affairs of the marital partnership through commingling." *Id.* at 135, 136.

With respect to the "commingling" consideration, in *Olson*, we explained that commingling "depends to a large extent on intent, that is, on whether a spouse had intended to retain the separately acquired asset as separate property or whether, instead, that spouse's treatment of the separately

she does not explain how or why those contributions—either directly or indirectly—somehow contributed to the portion of the disputed property that is a marital asset, particularly where the property was essentially managed by third parties.

acquired asset demonstrated an intent for that asset to become a joint asset of the marital partnership." 218 Or App at 12 (internal quotation marks omitted). As the court instructed in *Kunze*, a variety of considerations may bear on a spouse's intent, including "(1) whether the disputed property was jointly or separately held; (2) whether the parties shared control over the disputed property; and (3) *the degree of reliance upon the disputed property as a joint asset.*" 337 Or at 141 (emphasis added). In sum, "[i]ntent * * * depends not on what a spouse might privately contemplate or even publicly declare; it depends on how a spouse *acts*, that is, on what the spouse's treatment of the asset demonstrates." *Lind*, 207 Or App at 67 (brackets and internal quotation marks omitted; emphasis in original).

Commingling is a relative, not an absolute, concept, which may vary according to a spouse's treatment of a particular asset. As we explained in *Tsukamaki and Tsukamaki*, 199 Or App 577, 586, 112 P3d 416 (2005),

"[b]ecause it is an equitable consideration, commingling is not an all or nothing proposition. Instead, commingling falls along a spectrum. In some cases, a particular asset may be commingled to such an extent that it would be inequitable to divide it in any manner other than equally. In other cases, an asset may be less commingled and therefore subject to a split into unequal shares."

Here, two equitable considerations—neither of which appears to have been considered by the trial court—guide our review of the just and proper distribution of the disputed property. First, we consider the "social and financial objectives of the dissolution." *Kunze*, 337 Or at 135. Second, we consider the extent to which husband has integrated his interest in the disputed property "into the common financial affairs of the marital partnership through commingling." *Id.* at 136.

With respect to the first consideration, we have previously explained that, "in a long-term marriage, * * * 'the parties should separate on as equal a basis as possible.' " *Boyd and Boyd*, 226 Or App 292, 299, 203 P3d 312 (2009) (quoting *Stice and Stice*, 308 Or 316, 327, 779 P2d 1020 (1989)). That is so because,

"[w]hen couples enter marriage, they ordinarily commit themselves to an indefinite shared future of which shared finances are a part. Acquisitions are made, forgone or replaced for the good of the family unit rather than for the financial interests of either spouse. Property is bought, sold, enhanced, diminished, intermixed and used without regard to ease of division upon termination of the marriage."

*Jenks and Jenks*, 294 Or 236, 242, 656 P2d 286 (1982). In fact, this long-term marriage was marked by the dynamic contemplated in *Boyd*.

With respect to the second consideration, as previously indicated, 248 Or App at 590, the parties generally made financial decisions together based on what was in the best interest of their family as a whole. For example, wife contributed to the ophthalmology practice without drawing a salary to reduce the parties' tax burden and to maximize the amount of money available to the family unit.

Moreover, as husband acknowledged, the existence of the disputed property influenced—at least to some extent—financial decisions that were made during the marriage. As husband noted, "we would call on it if we needed it." In particular, the funds in the Smith Barney account were easily accessible by husband during the marriage, and, when necessary, he used funds from that account for family purposes. *See Kunze*, 337 Or at 141 (stating that one consideration that bears on a spouse's intent is "the degree of reliance upon the disputed property as a joint asset").

Significantly, husband used money from the Smith Barney account to make maximum contributions to one of his and wife's retirement accounts each year and, within a few years of the parties' marriage, decided that he no longer needed life insurance, in part, because wife and their children would receive the benefit of the disputed property if he predeceased them. Those acts demonstrate that, despite the fact that the disputed property was separately held by husband and that wife had no control over that property, husband intended—at least until the marriage deteriorated—for the disputed property as a whole to be available to the family

unit when necessary.[15] Husband's intent in that regard is not negated by the fact that the parties did not need to use the disputed property to pay for their daily expenses.

On balance, in light of husband's limited commingling of the disputed property and the long-term nature of the parties' marriage, it is just and proper for wife to receive a portion of those assets. In reaching a contrary determination, the trial court appears to have focused only on the fact that wife would achieve economic self-sufficiency without sharing in the disputed property. However, in a case such as this, in which the parties have more than ample assets, economic self-sufficiency is not the dispositive factor in the equitable calculus. Accordingly, a just and proper division of property requires a recalibration of the trial court's award. *See Hanscam*, 247 Or App at 217-18 (noting that a trial court's determination of what property division is just and proper is a matter of discretion and reasoning that "[w]e examine the trial court's decision based on the pertinent statutory and equitable considerations * * *, and we will not disturb the trial court's award unless we conclude that the court misapplied those factors").

In sum, it is just and proper for wife to receive an additional $2 million in property. In the end, wife will leave the marriage with approximately $4.6 million in assets, and husband will leave the marriage with $10.7 million in assets. In order to effectuate that award, we will not disturb any portion of the trial court's property division other than to award wife an equalizing judgment in the amount of $2 million.

In light of that recalibrated property division, we turn to wife's contention that the trial court erred in the amount and duration of its award of spousal support. The trial court awarded wife maintenance support of $2,000 per month for two years followed by $1,000 per month for three

---

[15] It is those facts that distinguish this case from others in which we have held that the limited sharing of a separately held investment account for the payment of living expenses does not demonstrate an intent to treat the entire account as joint property. *See Gano-Ridge and Ridge*, 211 Or App 393, 403, 155 P3d 84, *adh'd to as modified on recons*, 213 Or App 235, 159 P3d 1292 (2007); *Winkler and Winkler*, 200 Or App 524, 535, 115 P3d 948, *rev den*, 339 Or 475 (2005).

years—that is, support until wife reaches full retirement age. On appeal, wife contends that, if she is not awarded half of the disputed property, she is entitled to $10,000 per month in indefinite maintenance support in light of the substantial income that husband's investment property will generate. We disagree.

"The loadstar of a court's charge is to make a spousal support award that is 'just and equitable,' ORS 107.105(1)(d), and the ultimate decision concerning the amount and duration of a maintenance spousal support award is a discretionary one." *Bailey and Bailey*, 248 Or App 271, 276, 273 P3d 263 (2012). ORS 107.105(1)(d)(C) (2007)[16] identified a nonexclusive list of factors that a court should consider in awarding maintenance support:

"(i)   The duration of the marriage;

"(ii)   The age of the parties;

"(iii)   The health of the parties, including their physical, mental and emotional condition;

"(iv)   The standard of living established during the marriage;

"(v)   The relative income and earning capacity of the parties, recognizing that the wage earner's continuing income may be a basis for support distinct from the income that the supported spouse may receive from the distribution of marital property;

"(vi)   A party's training and employment skills;

"(vii)   A party's work experience;

"(viii)   The financial needs and resources of each party;

"(ix)   The tax consequences to each party;

"(x)   A party's custodial and child support responsibilities; and

---

[16] ORS 107.105(1)(d) was amended in 2011. Or Laws 2011, ch 115, § 2. Those amendments "apply to proceedings commenced on or after" January 1, 2012. Or Laws 2011, ch 115, § 3. Accordingly, because those amendments are inapposite here, we apply the 2007 version of the statute, which was in effect when the trial court entered its judgment.

"(xi) Any other factors the court deems just and equitable."

Although no single factor is dispositive, "the primary goal of spousal support in a long-term marriage such as this is to provide a standard of living roughly comparable to the one enjoyed during the marriage." *Boyd*, 226 Or App at 301. In short, under the circumstances of this case and in light of the recalibrated property award, wife will receive assets that will generate income sufficient to allow her to enjoy a standard of living that is not overly disproportionate to the one that the parties enjoyed during the marriage. Accordingly, we reject wife's contentions but otherwise affirm the trial court's spousal support award.

Finally, we turn to wife's contention that "[t]he trial court erred in denying [her] attorney fee request prior to reviewing it." Because we have significantly modified the trial court's property division, we vacate the trial court's decision concerning attorney fees and remand for reconsideration on that issue. *See Proctor and Proctor*, 204 Or App 250, 252, 129 P3d 186, *rev den*, 340 Or 672 (2006) ("In light of our decision to reverse and remand the property division for reconsideration, we vacate the trial court's decision on attorney fees and remand for reconsideration of that issue as well.").

Judgment modified to award wife an equalizing judgment of $2 million; attorney fee decision vacated and remanded for reconsideration; otherwise affirmed.