Argued and submitted September 24, 2009, affirmed on appeal; on cross-appeal, reversed and remanded for entry of judgment (1) awarding wife $529,500; (2) awarding transitional spousal support of $3,000 per month for three years and maintenance support of $3,000 per month for six years; (3) providing husband with a credit against the property division for his payment of wife's attorney fees charged by wife to a credit card; and (4) requiring the parties to bear their own attorney fees; otherwise affirmed July 28, 2010

## In the Matter of the Marriage of

Greg P. CARLSON,
*Petitioner-Respondent
Cross-Appellant,*

*and*

Lisanicole CARLSON,
aka Lisa-Nicole Carlson,
nka Lisa Nicole Miller,
*Respondent-Appellant
Cross-Respondent.*

Clackamas County Circuit Court
DR05100670; A135925

236 P3d 810

Gary Zimmer argued the cause for appellant - cross-respondent. On the briefs were Peter Bunch, Angela M. Bentz, and Zimmer & Bunch LLC.

Helen C. Tompkins argued the cause and filed the briefs for respondent - cross-appellant.

Before Landau, Presiding Judge, and Schuman, Judge, and Ortega, Judge.

LANDAU, P. J.

## LANDAU, P. J.

Wife appeals a dissolution judgment, assigning error to the property division and the spousal support award. Husband cross-appeals, also assigning error to the property division and spousal support award, and further contending that the trial court erred in requiring him to pay wife's attorney fees. On *de novo* review, ORS 19.415(3) (2007),[1] we modify the judgment by revising the property division, reducing the spousal support award, requiring the parties to bear their own attorney fees, and providing husband with a credit against the property division for his payment of wife's attorney fees that were charged by wife to a joint credit card; we otherwise affirm.

## I.  FACTS

### A.  *Background*

The parties began living together in February 2000. At the time, wife worked as a cosmetologist. She had few assets; she owned a car and some Intel stock. Husband worked for The Carlson Group, a business that he owned with his brother. Husband had substantial assets, including an investment account of $37,543, a retirement account with a value of $38,000, a substantial savings account, a 1,200-square-foot house on Mara Court, and his half interest in The Carlson Group, valued at the time at $186,000.

While living together, the parties shared some expenses and household responsibilities. Husband paid the mortgage and utilities, and wife paid for household items and groceries. Wife encouraged husband to let go of his housekeeper, and then took over the housekeeping duties, including the cleaning, cooking, laundry, and care of the parties' pets. She undertook to redecorate the house and paid for many household items out of her own funds.

Other than sharing household expenses, however, the parties did not commingle their assets or finances. There were no joint accounts; husband did not transfer to wife any

---

[1] This case was filed before the effective date of the 2009 amendments to ORS 19.415(3)(b) that made *de novo* review discretionary with the Court of Appeals. Or Laws 2009, ch 231, § 2.

interest in any of his bank, stock, or retirement accounts. Likewise, husband did not transfer to wife any interest in his business or in his real estate. Husband did tell her that she should consider the Mara Court house to be "theirs." He also shared his financial information with wife and told her that on paper "we're millionaires."

In 2000, wife, who has a history of back problems, began experiencing more severe symptoms. In September 2001, she had back surgery. After her surgery, wife was unable to return to work and she had no income. Husband added her name to one of his credit cards.

In February 2002, the parties were married in Hawaii. In the summer of 2002, the parties decided to sell the Mara Court house and move to a larger home. Wife assumed responsibility for the sale, including marketing the property and negotiating with the buyer. The parties used the proceeds of the sale as a down payment for the purchase of a house of approximately 5,000 square feet (the West Linn house). Wife coordinated the move to the West Linn house, and oversaw the packing and unpacking of their belongings. Because husband had stronger credit, the parties purchased the home in his name.

Husband's business continued to grow. At the time of the marriage in February 2002, the value of the business had grown to $1.2 million. The business's value included a significant amount of retained earnings. Wife did not have any involvement in the business itself; however, she decorated husband's offices and discussed the business with him.

In September 2002, one month after moving into the West Linn house, wife reinjured her back when she fell after tripping over a dishwasher rack that had been left on the floor by a repairman. Wife recovered a substantial settlement as a result of that injury. In the meantime, however, wife became increasingly dependent on anti-inflammatory and pain medications. She suffered from depression and anxiety. She developed side effects of her pain medication, including migraines, acid reflux, and hair loss.

Nonetheless, wife managed her symptoms and accomplished many projects around the house. With the

assistance of a housekeeper who cleaned twice a month, wife continued to be responsible for the management of the household. She oversaw repairs of the plumbing and electrical systems and the replacement of the furnaces and air conditioners. In addition, wife undertook and oversaw a redecorating of the West Linn house and a redesign of the landscaping. Wife was also primarily responsible for overseeing the maintenance of the parties' cars. Husband had household responsibilities as well, including maintaining the exterior of the house, mowing the lawn, and taking out the garbage, but his duties were not as extensive as wife's. The parties shopped together for new furniture, but wife alone selected decorating items. Wife enjoyed decorating, and during 2003 she completed an interior design program and became certified as an interior designer.

In September 2004, wife had a second back surgery, and her back condition began gradually to improve. But she continued to experience back pain, as well as symptoms related to her dependence on medication. In September 2005, she and husband decided that she should undergo a one-week detoxification therapy at a Florida clinic to reduce her dependence on pain medication. Husband accompanied her, but, before leaving for Florida in October 2005, he told her that he would be seeking a divorce when they returned.

In November 2005, husband filed a petition for dissolution. Wife filed a response and subsequently sought and received the court's permission to file an amended response asserting a separate, stand-alone claim for dissolution of a domestic partnership with respect to the years that the parties had cohabited before the marriage. Although no amended response was filed, the dissolution judgment recites that the parties had cohabited prior to the marriage and that the marriage terminated their "domestic partnership."

At the time of trial, husband, then 44, was in excellent health. Wife, 37, continued to suffer from back pain and other related health issues. Husband continued to be employed in The Carlson Group. Wife, meanwhile, was unemployed, and the evidence at trial shows that, although she is highly motivated to begin work as an interior designer,

it is unlikely that she could sustain full-time employment in the near future, because of health issues.

At the time of trial, the marital property consisted of the West Linn house, with a net equity of $349,606; husband's 401(k) profit-sharing plan, with a net after tax value of $62,870; husband's investment account, with a value of $193,805; the parties' joint checking account, with funds of $38,581; an account bearing wife's personal injury settlement of $160,699; wife's investment account and her Intel stock, which together had a value of about $10,000; and husband's business. The value of the business was a matter of some dispute. Wife's expert witness opined that the business was worth approximately $3.53 million; husband's expert said that the business was worth $2.72 million. The trial court found wife's expert more persuasive and valued the business at $3.53 million.

Husband proposed that the parties share equally in the equity in the West Linn house and the marital appreciation of husband's investment account and his 401(k) account; that wife be awarded her personal injury settlement; and that wife have a judgment equal to 20 percent of the marital appreciation of The Carlson Group (as valued by husband's expert), or approximately $266,200. Husband offered spousal support of $4,000 per month for three years and $2,000 per month for one year.

Wife asserted that, before the parties married, they had entered into a domestic partnership and that, as a result, she was entitled to an equal share of the approximately $1 million in the increase in value of The Carlson Group from the time the parties began living together until the date of their marriage. She also sought indefinite spousal support of $8,500 per month.

B. *The trial court's decision*

The trial court carefully considered the parties' arguments and divided the property following a fairly complex method of analysis that appears to have blended considerations pertaining to the division of property following the dissolution of a domestic partnership and the dissolution of a marriage. The court found that, during the two-year period of

cohabitation preceding the marriage, the parties intended to form a domestic partnership and that they intended that all the property that husband brought into the relationship be regarded as joint property. In consequence, the court explained, the Mara Court house, husband's investment accounts, and The Carlson Group are marital assets, which are subject to a presumption that the parties equally contributed to their value.

The court then determined that, although The Carlson Group is a marital asset, it is not just and proper to include any of the appreciation in the value that occurred before the marriage. The court therefore discounted approximately $1.2 million from the company's total value, for a net of $2.32 million. The court then found that, because wife "had little to do directly with the company," it is appropriate to consider only 60 percent of the remaining $2.23 million as a marital asset to be divided between the parties, that is, $1.399 million. The court then split that $1.399 million in half and awarded one half—$699,600—to each party, with ownership of the business itself along with any remaining value awarded to husband.

The court awarded the West Linn residence to wife. The court also awarded wife the proceeds from the settlement of her personal injury claim. The remaining accounts—the 401(k) profit-sharing plan and husband's investment accounts—were awarded to husband. The court further ordered husband to pay $40,160 in credit card debt that wife had accumulated in the month before trial, consisting mostly of attorney fee charges.

Turning to spousal support, the court found a significant disparity in the parties' incomes and earning potential. The court found that husband's income was $14,500 per month, not including his bonuses and retained earnings that are significantly more than his salary. The court determined that, because of wife's health problems, she will not be able to work full time in the near term, but that, in light of her desire to return to work, after the stress of the dissolution is behind her wife will be able to work at a level that will allow her to be reasonably self-supporting. The court awarded wife transitional support of $6,000 per month for three years, followed

by $3,000 per month for three years. It also awarded indefinite maintenance support of $2,000 per month.

## II. ANALYSIS

On appeal, wife advances three assignments of error. First, she contends that the trial court erred in failing to award her half of the appreciation in value of The Carlson Group that occurred during the two-year period of cohabitation before the marriage. Second, she assigns error to the failure of the court to award her half of the appreciation in value of that business that occurred during the marriage. Third, she assigns error to the failure of the court to award her the $8,500 per month of indefinite support that she requested at trial.

Husband cross-appeals, advancing a number of assignments of his own. He contends that the trial court erred in awarding wife any share of the premarital assets. He argues that the trial court further erred in awarding wife any share of the increase in the value of his business that occurred during the marriage. In any event, he contends, the trial court erred in placing too high a value on the business. In addition, husband argues that the court erred in failing to credit him for payment of a share of wife's debts. Finally, husband assigns error to the trial court's spousal support award. According to husband, the court awarded too much transitional support and should not have awarded any maintenance support, much less indefinite maintenance support.

### A. *Distribution of premarital assets*

■ We begin with the parties' contentions concerning the distribution of the assets that husband brought to the relationship, in particular, the appreciation in value of The Carlson Group during the two-year period of cohabitation that occurred before the parties married. Wife contends that, once the trial court determined that the parties had entered into a domestic partnership during their cohabitation, it was obliged to award her an equal share of the appreciation in the value of the business during that time. Husband contends that the trial court did not err in failing to award her half of the appreciation in the value of the business during their cohabitation; indeed, as we have noted, husband contends

that the trial court erred in finding that there was a domestic partnership at all.

Under ORS 107.105(1)(f), the property that is subject to the dispositional authority of the court in a dissolution case consists of two classes. First, there is "the real or personal property, or both, of either or both of the parties," ORS 107.105(1)(f), consisting of any property that the parties possess at the time of the dissolution, regardless of when the property was first acquired. *Pierson and Pierson*, 294 Or 117, 121-22, 653 P2d 1258 (1982). That property is commonly called "marital property." *Massee and Massee*, 328 Or 195, 201 n 2, 970 P2d 1203 (1999). The distribution of marital property in a dissolution is governed by a statutory standard of what is "just and proper in all the circumstances." ORS 107.105(1)(f); *Kunze and Kunze*, 337 Or 122, 134, 92 P3d 100 (2004).

Second, there is a subset of that property, called "marital assets," which refers to the marital property that was acquired by either party, or both, *during* the marriage. *Pierson*, 294 Or at 121. A presumption of equal contribution applies to marital assets. ORS 107.105(1)(f). If the presumption has not been rebutted, the property ordinarily will be divided equally between the parties. *Kunze*, 337 Or at 134. If the presumption has been rebutted, then the property must be divided in a manner that is just and proper under all the circumstances. *Id.*

In this case, wife acknowledges that the appreciation in the value of The Carlson Group during the period of cohabitation before the marriage is not a marital asset to which the presumption of equal contribution applies. Wife contends that, nevertheless, she is entitled to half the value of that appreciation as a matter of law because the division of that appreciation is governed not by ORS 107.105(1)(f) but by principles that apply to the division of property following the dissolution of a domestic partnership. According to wife, the trial court expressly or implicitly found the existence of such a domestic partnership during the two-year period of cohabitation preceding the marriage and, in consequence of that finding, she is entitled to half the appreciation that occurred during the existence of that partnership.

Whether the law requires us to segment relationships such as the parties' in this case into periods of domestic partnership and marriage and then divide the property accordingly is an interesting question. But it is one that we need not decide in this case. Even assuming that the parties lived in a domestic partnership before their marriage, the division of partnership assets is determined by the intention of the parties and, contrary to the view of the trial court, the evidence is clear that husband and wife in this case did not intend to share ownership of husband's business.

■■ In determining how property should be distributed following the termination of a domestic partnership, the primary consideration is the express or implied intent of the parties. *Beal v. Beal*, 282 Or 115, 122, 577 P2d 507 (1978). In the absence of an express agreement, we examine the evidence and inferences that can be drawn from it to determine "what the parties implicitly agreed upon" and whether the parties "intended to pool their resources for their common benefit." *Id*. If the evidence indicates that the parties had that intent, then property acquired during the relationship is considered to be jointly owned, and should be divided accordingly. *Id*.

■ Factors that are considered relevant to the issue include "how the parties held themselves out to their community, the nature of the cohabitation, joint acts of a financial nature, if any, how title to the property was held, and the respective financial and nonfinancial contributions of each party." *Wallender v. Wallender*, 126 Or App 614, 617, 870 P2d 232, *rev den*, 319 Or 150 (1994); *see also Baker and Andrews*, 232 Or App 646, 652, 223 P3d 417 (2009) ("In general, an equitable property division on dissolution of domestic partnership is appropriate where the parties' intent to share assets and expenses is shown by evidence that they have jointly purchased, built, or maintained property, held joint accounts, and made substantial economic and noneconomic contributions to the household for mutual benefit."); *Lind and Lind*, 207 Or App 56, 67, 139 P3d 1032 (2006) (in determining extent to which separately acquired assets have been commingled "into the common financial affairs of the marital partnership" for purposes of a just and proper division of marital property, the court determines the spouse's intent by examining how the spouse acts with respect to that asset).

The manifest intentions of the parties may be different as to discrete assets. *Wallender*, 126 Or App at 617.

In this case, the evidence shows that, during the two-year period of cohabitation before the marriage, husband shared the Mara Court house with wife. The parties lived in the Mara Court house together and jointly maintained it; husband told wife that she should consider the house "theirs." The evidence, however, does not establish that husband intended for wife to share equally in The Carlson Group's appreciated value. With the exception of adding wife's name to one credit card after her first back surgery, there were no joint financial endeavors or commitments. The parties did not share a bank account, and husband did not place wife's name on his assets; nor did she place his name on hers. Wife, by her own admission, did not participate in the business of The Carlson Group and made no financial contribution to it. We therefore reject wife's contention that, by virtue of the existence of a domestic partnership during the first two years of the parties' relationship, she is entitled to half the appreciation in the value of husband's business during that time.

## B.  *The disposition of The Carlson Group*

Our rejection of wife's contention that she is entitled to half the increase in value of the business that occurred before the marriage does not end the matter. The entire business is marital property, subject to the dispositional authority of the court. Moreover, a significant portion of that total value consists of appreciation that occurred during the marriage, making that portion a marital asset that is subject to a presumption of equal contribution. Our task, therefore, is first to determine whether husband rebutted the presumption of equal contribution as to the marital asset portion of the business. If he did not rebut the presumption, then we split that portion of the business equally and divide the balance in a manner that is just and proper under all the circumstances. *Kunze*, 337 Or at 134. If he did rebut the presumption, then we would simply divide the business in a manner that is just and proper under all the circumstances. *Id.*

As we have noted, the trial court did not engage in that analysis. Instead, it simply subtracted from further consideration the premarital appreciation and then determined

that, because wife contributed relatively little to the appreciation that occurred during the marriage, only 60 percent of that appreciation would be considered a marital asset. That was error. Whether property is a marital asset is determined solely by reference to when it was acquired. The relative contribution to the increase in the value of a marital asset may appropriately weigh in the division of that value, but it does not mean that it is any less a marital asset. With that in mind, we turn to the disposition of the property in this case.

Wife contends that husband failed to rebut the presumption of equal contribution that applies to the appreciation in the value of The Carlson Group that occurred during the marriage. Husband contends that he did rebut the presumption of equal contribution and that wife should be awarded no more than 10 percent of the appreciation in value that occurred during the marriage. Husband, moreover, contends that, in applying the 10 percent, we should reject the trial court's valuation and substitute the lower valuation that husband's expert suggested at trial. We reject husband's contentions concerning the valuation of the business without discussion and turn to the question whether husband rebutted the presumption of equal contribution with respect to the $2.3 million in appreciation in value of The Carlson Group that occurred during the marriage.

■■ The burden is on the party seeking to overcome the presumption to prove, by a preponderance of the evidence, that the other spouse did not make an equal contribution to the acquisition of the disputed marital asset. *Kunze*, 337 Or at 134. In evaluating whether the presumption has been rebutted, ORS 107.105(1)(f) requires us to consider a spouse's work as a homemaker as a contribution to the acquisition of marital assets. As the Supreme Court explained in *Stice and Stice*, 308 Or 316, 329, 779 P2d 1020 (1989), the statute "effectively places the homemaker-spouse's non-economic contributions on par with the breadwinner-spouse's direct economic contribution to the acquisition of property." *See also Massee*, 328 Or at 204-05 ("The court also must keep in mind that, in the categorical sense, a homemaker spouse's contribution in a domestic setting is indistinguishable analytically

from the breadwinner spouse's contribution to the acquisition of marital assets in a business or other nondomestic setting.").

The fact that a spouse worked as a homemaker, however, does not conclusively establish that the spouse's contribution to the acquisition of an asset was equal. *Hixson and Hixsson*, 235 Or App 217, 225, 230 P3d 946 (2010). In *Massee*, the court explained that, while the statute requires that the work of the homemaker be considered a contribution, the value of that contribution must be assessed:

> "In deciding whether the presumption of equal contribution is rebutted, the court first must determine the magnitude of each spouse's overall contribution to the acquisition of marital assets from evidence in the record. If one spouse is a homemaker, that determination necessarily will include an assessment of the homemaker spouse's contribution to the enterprise of homemaking. A homemaker spouse's overall contribution may consist of a combination of domestic contributions and economic or other nondomestic contributions.
>
> "Once the court has determined each spouse's overall contribution to the acquisition of marital assets, the court compares the respective contributions of the spouses. The ultimate question is whether the spouse seeking to rebut the presumption of equal contribution has proved, by a preponderance of the evidence, that the other spouse did not contribute equally to the acquisition of marital assets."

328 Or at 205 (footnote omitted). Depending on the record of each case, the overall contributions of a homemaker spouse to the acquisition of an asset could be found to be equal; just as conceivably, depending on the record, the overall contributions of the parties to the acquisition of a marital asset could be unequal. Again, as the court explained in *Massee*, the homemaker spouse provision of ORS 107.105(1)(f) "does not assign any particular evidentiary weight to the homemaker's contribution. The court must determine the magnitude and, thus, the legal effect of a homemaker's contribution to the acquisition of marital assets in accordance with the evidence in each case." *Id.* at 203.

It bears emphasis that that does not mean that we simply place an economic value on the specific tasks that make up the homemaker spouse's contributions. *Massee* makes clear that the homemaker spouse's contributions may be economic or noneconomic. *Id.* at 205. A homemaker, for example, may stay at home and raise the parties' children. The value of that work is not simply measured in terms of the economic value of child care; rather, it entails evaluating the extent to which such work also enables the other spouse to travel or devote time and energy to the development of a business that otherwise would have been devoted to the day-to-day obligations of child rearing. *English and English*, 223 Or App 196, 206, 194 P3d 887 (2008).

In cases in which the marital asset in dispute is a business, however, it is important to connect the work of the homemaker spouse—directly or indirectly—to the development of that business. In that regard, our opinion in *Hixson* is instructive. In that case, the dispute focused on the extent to which the wife, a homemaker, contributed to the appreciation in value of the husband's veterinary clinic during the marriage. The wife was not involved in the daily affairs of the clinic. She did not work at the clinic. She did occasionally assist with holiday parties and took emergency calls after business hours. 235 Or App at 225. She also provided support at home by cooking and keeping house. *Id.* at 227. The growth of the business, however, was largely due to the efforts of the husband and the clinic's employees. *Id.* We concluded that, under the circumstances, the husband had rebutted the presumption of equal contribution. *Id.* We explained that the wife's contributions, while not insignificant, were not equal to the husband's in terms of the growth in the value of the business. *Id.*

With the foregoing principles in mind, we turn to the record in this case. Wife emphasizes her role as homemaker, especially her role in redecorating the parties' homes and caring for their pets, and asserts that her contributions to the relationship as a homemaker support the presumption of equal contribution. Husband contends that, to the extent that wife's work as homemaker made any contribution to the business, that contribution was not equal.

We find, as did the trial court, that wife was a homemaker. Wife assumes that, because she was a homemaker, she has conclusively established that her overall and respective contribution to the acquisition of the appreciation in The Carlson Group was equal to husband's. As we have explained, that is not the case. The question is the relative value of wife's direct or indirect contributions to the growth of the business.

In this case, wife, as homemaker, was primarily responsible for the management of the household. Our assessment of the record, however, is that wife's homemaking contribution was limited. *Cf. Niman and Niman*, 206 Or App 259, 267, 136 P3d 105 (2006) (wife's homemaking contribution, which included raising the parties' children and contributing her salary, was "substantial"). The parties did not have children. After moving into the West Linn house, the parties had a housekeeper who cleaned the house twice a month. Husband also shared in the household responsibilities, by vacuuming, washing dishes after meals, taking out the garbage, and mowing the lawn. Husband helped more when wife was disabled because of back pain or when she was recovering from surgery. He also paid for wife's redecorating projects.

Wife makes much of her efforts to care for the parties' pets and redecorate both houses. The record bears out that, despite her back problems, wife cared for the parties' pets (including taking them to numerous veterinary appointments, feeding them special diets, administering daily oral medications and weekly injections, and bathing them monthly with three different shampoos), and redecorated the parties' homes, including two separate trips to Seattle to select ceramic pots for the yard. It is true that wife's oversight of those projects meant that husband did not need to worry about them. However, considering husband's relatively frugal lifestyle before the relationship, we are not persuaded that husband would have undertaken the redecorating projects on his own, nor are we persuaded that wife's efforts contributed indirectly to the appreciation of The Carlson Group or freed husband to devote more time and energy to his business. *Massee*, 328 Or at 202-03.

Further, wife made no direct contribution to the acquisition or growth of the business, either economically or by working there. *See Winkler and Winkler*, 200 Or App 524, 532, 115 P3d 948, *rev den*, 339 Or 475 (2005) (the wife was a homemaker and also participated equally in management of vineyard business); *Ward and Ward*, 165 Or App 426, 429, 998 P2d 691 (2000) (the wife was a homemaker and worked full time in real estate business); *Hall and Hall*, 159 Or App 196, 200, 977 P2d 387 (1999) (the wife was a homemaker and worked full time in chiropractic business).

■ Wife argues that the business's retention of earnings that otherwise would have been income to husband should be considered an economic contribution by wife. We agree with wife that a portion of the business's retained earnings that otherwise could have been income to husband are considered to be a contribution by wife. *Olinger and Olinger*, 75 Or App 351, 355-56, 707 P2d 64 (1984), *rev den*, 300 Or 367 (1985). However, we reject wife's contention that she should be credited on an equal basis to husband for that contribution. Unlike in *Olinger*, wife did not work in the business. *Id.* at 353. Those retained earnings were compensation for husband's own efforts. And, unlike in *Olinger*, where there was significant commingling, *id.* at 355, in this case, other than as a source of income, the assets of the marriage were not otherwise commingled with the business. We find that wife's contribution as a homemaker, although supportive of husband's business, was not equal to his. Thus, although the appreciation in The Carlson Group is a marital asset subject to the presumption of equal contribution, we conclude that husband rebutted that presumption.

■ We reject husband's contention, however, that wife's homemaker activities made *no* contribution to the growth of the business and that it is therefore just and proper to award the appreciation in The Carlson Group exclusively to him. That would be contrary to the Supreme Court's admonition in *Massee* that the failure to attribute "even an *indirect* contribution improperly deprives [a homemaker spouse] of the consideration of her homemaker contribution to which she is entitled by ORS 107.105(1)(f)." 328 Or at 208 (emphasis in original). However, considering wife's moderate homemaking efforts, the dramatic growth of the business over the short

duration of the marriage—largely due to husband's efforts—and wife's testimony that she had little to do with the business, we conclude that the evidence establishes that wife's overall contribution to the business's growth was minimal. *Cf. Morton and Morton*, 99 Or App 146, 781 P2d 869 (1989).

Having concluded that husband has rebutted the presumption of equal contribution to the appreciation of The Carlson Group and that wife's overall contribution to that enterprise was small, it is necessary to determine, with due consideration to wife's homemaker contribution, how to distribute that marital asset based on what is "just and proper in all the circumstances." *Kunze*, 337 Or at 135 ("If a party ultimately rebuts the presumption * * * then the court decides how to distribute that marital asset without regard to any presumption and, instead considers only what is 'just and proper in all the circumstances,' including the proven contributions of the parties to the asset."); *see also* ORS 107.105(1)(f).

In addition to the statutory factors, the "just and proper" division of marital property takes into account the social and financial objectives of the dissolution, as well as other considerations that may bear upon the question of what division of the marital property is equitable. Some of those equitable considerations include the preservation of assets; the achievement of economic self-sufficiency for both spouses; the particular needs of the parties; and the extent to which a party has integrated a separately acquired asset into the common financial affairs of the marital partnership through commingling. *Kunze*, 337 Or at 136.

In this case, we find that an award of 15 percent of the appreciation in the value of the business is just and proper under all the circumstances. Wife came into the marriage with few assets. Including the period of cohabitation, the parties were together for six years, which is a relatively brief relationship. During that time, husband's business grew dramatically, largely because of his own efforts and largely free of any contribution from wife. We note, however, that wife's contributions, though relatively limited, were not restricted to the time that the parties were married but include the time during which the parties lived together

before the marriage. Under the circumstances, it seems to us equitable to take wife's contribution during that period of time into account and, as a result, to require that the 15 percent apply to the total appreciation of the business, not just the appreciation that occurred during the marriage. *See Rudder and Rudder*, 230 Or App 437, 459, 217 P3d 183, *rev den*, 347 Or 365 (2009) (although not a marital asset, appreciation of an asset during a period of premarital cohabitation may be considered in the "just and proper" division of property). That share comes to $529,500. In light of the other assets awarded to wife, including the equity in the West Linn house of $349,000, wife's own personal injury settlement of $160,000, and wife's stock and investment accounts having a value of approximately $10,000, we conclude that the amount is just and proper. Wife leaves the six-year relationship with an excess of $1 million in assets, which should readily assist in her transition to self-sufficiency.

C. *Spousal support*

We move to consideration of spousal support. As we have noted, the trial court awarded wife monthly transitional support of $6,000 per month for three years, followed by stepped-down transitional support of $3,000 per month for three more years, for a total of six years of transitional support. The trial court also awarded maintenance support of $2,000 per month, indefinitely.

Wife asserts that, considering the standard of living enjoyed during the marriage, the disparity in the parties' earning capacities, and wife's health, the trial court should have awarded her more—that is, indefinite support of $8,500 per month. She contends that the trial court's award will not meet her monthly living expenses, which she listed on her uniform support affidavit as $12,500 (and later asserted at trial and on appeal are closer to $13,200). Those expenses include a monthly house payment of $2,400; $862 for landscaping, yard maintenance, housekeeper, pest control, carpet cleaning, gutter and window cleaning, and backflow testing; $1,250 for clothing, grooming, and personal expenses; $600 for upkeep of wife's 2001 Mercedes Benz (not including gas); $1,100 for food and household cleaning supplies; $400 for

entertainment; $450 for vacations; $400 for charitable contributions; and $1,670 per month for the pets.

On cross-appeal, husband also challenges the spousal support award, contending that both the duration and the amount of support are excessive. We address the parties' arguments together.

■■ ■■ The court is authorized by ORS 107.105(1)(d) to award spousal support in an amount and for a duration that is "just and equitable." Spousal support can take the form of transitional, compensatory, or maintenance support. Transitional support is appropriate "as needed for a party to attain education and training necessary to allow the party to prepare for reentry into the job market or for advancement therein." ORS 105.107(1)(d)(A); *English*, 223 Or App at 209. The purpose of maintenance support, in contrast, is to allow one spouse who is financially able to contribute to the support of the other spouse the time necessary to allow the dependent spouse to become financially independent and self-supporting. *Roppe and Roppe*, 186 Or App 632, 635 n 4, 64 P3d 1145 (2003). In this case, the trial court awarded both transitional and maintenance support.

■■ In deciding whether, how much, and for how long spousal support should be ordered, we do not attempt merely to eliminate any disparities in the parties' incomes or to enable one spouse to look to the other indefinitely for support. *Wolhaupter-Heinzel and Heinzel*, 108 Or App 514, 521, 816 P2d 672, *rev den*, 312 Or 526 (1991). As we recently stated in *McLauchlan and McLauchlan*, 227 Or App 476, 489, 206 P3d 622, *rev den*, 346 Or 363 (2009), in determining the amount and duration of support, we keep in mind " 'the goal of ending the support-dependency relationship within a reasonable time if that can be accomplished without injustice or undue hardship.' " *Id.* (quoting *Taylor and Taylor*, 136 Or App 416, 419, 902 P2d 120 (1995)). Additionally, the court must consider the other financial provisions of the judgment, and none can be considered in isolation. *Grove and Grove*, 280 Or 341, 344, 571 P2d 477, *modified on other grounds*, 280 Or 769, 572 P2d 1320 (1977).

Among the factors relevant to transitional spousal support are the duration of the relationship (including,

where appropriate, a period of premarital cohabitation, *see Lind*, 207 Or App at 70), a party's training and employment skills and work experience, and the financial needs and resources of each party. ORS 107.105(1)(d)(A).

█ In this case, we conclude that some transitional support is appropriate. Wife has not worked outside the home since her first back surgery in 2001. Because of her back problems, it would be difficult for wife to return to her work as a cosmetologist. Although she has been trained as an interior designer and has begun the process of starting a business, she has yet to establish herself. As shown on wife's uniform support affidavit, her financial needs are substantial, and her current resources do not begin to meet them. Husband's stated needs are less than half of wife's, and his resources are much greater.

Wife, however, is not without resources. The property division awards to wife a share of the marital property sufficient to allow her to either stay in the West Linn house or purchase other suitable housing. Wife stated that, when her health allows, she hopes to earn $60,000 to $80,000 per year as an interior designer. However, it will no doubt take time for wife to meet that goal, and for that reason it is appropriate to award transitional support. ORS 107.105(1)(d)(A). We find that an award of $3,000 in transitional support for three years is appropriate to allow wife to regain her health and build up a design business or otherwise prepare for re-entry into the job market.

█ Factors relevant to an award of maintenance support include the duration of the marriage, the ages of the parties, the physical and emotional health of the parties, the standard of living established during the marriage, the parties' relative incomes and earning capacities, the parties' training, employment skills and work experience, their financial resources and needs, and the tax consequences of an award. ORS 107.105(1)(d)(C). Clearly, even with an award of support for wife's transition to employment, wife's income will not be sufficient for many years to cover her expenses or to allow her to be self-supporting. For that reason, an award of maintenance support is also appropriate. The question is

whether the award of maintenance support should be indefinite, as wife contends and as the trial court found, or definite, as husband contends.

The duration of the relationship and wife's age militate in favor of a definite period of support. As previously mentioned, the parties' relationship was relatively brief. Further, wife is young and has the skills and desire to become self-supporting. Wife's current health problems limit her present ability to work; for that reason, it is appropriate to award a longer period of maintenance support than might otherwise be warranted in a marriage of this duration. *See, e.g., Timm and Timm*, 200 Or App 621, 631, 117 P3d 301 (2005). However, the expectation is that, with time, wife's health will improve and allow her to work and that she will be able to be self-supporting. After her first surgery, wife had substantially recovered within one year. At trial, both she and her doctor were optimistic that her back would improve and allow her to return to work. Despite her back problems, wife kept active, decorating the parties' houses and caring for their pets. In light of those facts, and the goal of encouraging self-sufficiency and ending the support-dependency relationship, *McLauchlan*, 227 Or App at 489, we find that an award of six years of maintenance support is appropriate.

As for the amount of support, it is unrealistic for wife to expect that she will be able to maintain the lifestyle reflected by the expenses listed in her uniform support affidavit. The purpose of spousal support is not to equalize the parties' incomes, *Cullen and Cullen*, 223 Or App 183, 193, 194 P3d 866 (2008), but rather to enable the parties to live separately at a standard of living not overly disproportionate to that enjoyed during the marriage, *McCarthy and McCarthy*, 170 Or App 183, 12 P3d 519 (2000); ORS 107.105(1)(d). Considering each of the factors set out in ORS 107.105(1)(d)(C), and in light of the property division awarding wife a substantial share of the assets, we find that an award of maintenance support in the amount of $3,000 per month for six years, together with the three years of transitional support, will allow wife to have a very comfortable lifestyle and will also allow her a reasonable length of time to gain financial self-sufficiency.

■    We agree with husband that, in light of the property division, it is appropriate for wife to bear her own attorney fees and that husband should be credited in the property division for his payment of that portion of a credit card bill that is attributable to wife's attorney fees incurred during the pendency of the dissolution.

Affirmed on appeal. On cross-appeal, reversed and remanded for entry of judgment (1) awarding wife $529,500; (2) awarding transitional spousal support of $3,000 per month for three years and maintenance support of $3,000 per month for six years; (3) providing husband with a credit against the property division for his payment of wife's attorney fees charged by wife to a credit card; and (4) requiring the parties to bear their own attorney fees; otherwise affirmed.